Allen, J.
The appellant, in argument, has objected to the jurisdiction of a court of equity to grant relief upon the case made in the bill. It seems to me, the relation which the plaintiffs bore to the subject entitled them to the aid of a court of equity under the circumstances of this case. By the will of the testator, his executors were empowered to sell his lands, and after providing for the support of the widow and children, the residue of the money arising from the sale of the lands was to be put out at interest, and the portion of each to be paid on attaining the age of twenty-one. The executor sold the lands, and took bonds payable to himself, and a deed of trust to secure the payment. Upon the last of these bonds a large balance is claimed to be due. The executor and trustee has removed from the commonwealth. The bill avers, that many years *24 since, the bond was transferred to John W. Argyle, one of the legatees, to collect for himself and the others interested; that John W. Argyle has removed from the state; and that the complainants do not know where the bond is, or whether it is lost or destroyed. John W. Argyle is made a defendant, and the bill, both as to him and Curd the executor, is taken for confessed. The answer of Miller, though it denies that the bond was assigned to John W. Argyle for the benefit of the other legatees, admits that when payment was refused, John W. Argyle.returned the bond to Curd the trustee, who had it in his possession in 1825, and that it was then, and, as respondent believes, still is his property. The legatees had no legal right which they could assert in a court of law. As beneficiaries, and so entitled to this fund, equity alone could give them relief. Whether the bond is lost or destroyed, or is still in possession of the trustee, it is not pretended that the proceeds, if there be any thing due, are not the property of the legatees. The trustee, the legal owner, has removed from the commonwealth; and having failed to perform his duty by collecting the money, the legatees are of necessity driven into a court of equity, to assert their equitable title.
The debt was secured by a deed of trust, and the bill avers that the trustee has refused to act; and as to him the bill is taken for confessed. It is unnecessary to determine whether every creditor by deed of trust, like a mortgagee, has a right to call his debtor into a court of equity at his pleasure. Here it is averred that the trustee refused to act, and the bill is taken for confessed; and whether this would be considered as evidence, so as to affect the other defendant, or not, is immaterial in this case, as it is perfectly clear upon the facts, that it would have been improper for the trustee to sell until some proceeding was had to ascertain the amount due. The beneficiaries were ignorant of the *25 state of the accounts; the debtor refused to give them any information; and in this state of the affair, a sale by the trustee would have been irregular. If he had attempted to sell, a court of equity would have restrained him at the instance of the debtor. There can be no valid objection to the jurisdiction of the court, when invoked by the creditor in the first instance to ascertain the amount of the incumbrance, in a case where, at the instance of the debtor, the court would have arrested the trustee until the amount had been determined. I think that on both grounds the jurisdiction is clear.
Upon the merits, it is objected that the amount due cannot be determined until accounts are taken between Curd and his cestuis que trust, and between Miller and Curd. So far as Miller's interests are involved, an account between Curd and his cestuis que trust would seem to be unnecessary in this case. Curd has set up no claim to the proceeds of this bond. He is a party to the suit, and his rights will be bound by the decree. There seems to have been no question made in the case, that Curd held this bond in his fiduciary character alone. It cannot be a matter of any importance to Miller, how the accounts may stand between this fiduciary and the beneficiaries. If Miller owes the money, he is bound to pay it to some person, either to the trustee or the legatees; and as all are parties, any payment made under the decree will protect him against all claims hereafter.
As to the account between Miller and Curd, the bill was filed to adjust that, and it has accordingly been taken. The question as to the amount due arises upon the various aspects in which the account has been presented by the commissioner. The plaintiffs have not controverted the right of Curd to receive payments; they do not seek to charge Miller with money upon the ground of misapplication by their trustee; they allege *26 their willingness to allow .credit for all payments made to him, and have filed their bill to obtain from the defendant a disclosure of those payments. The demand was most reasonable, but has not been met with the frankness and candour to which it was entitled. The right of the plaintiffs to call for an exhibition of the accounts of payment is denied. Instead of the fair disclosure which common honesty required this debtor to make to these legatees seeking to gather up the fragments of their father’s estate mismanaged by their trustee, he contents himself with the general averment of payment. His answer, instead of explaining what seemed doubtful, appears designed to involve the transactions between Curd and himself in still deeper obscurity. The plaintiffs and the court are driven to the necessity of making up the account from such facts as were within their reach and furnished by the record. If it does not contain a full exhibition of all the transactions between Curd and the defendant, it is not for the latter to complain; it was certainly in his power to give a full explanation, if he had thought proper to do so. It has been argued that the defendant has a right to insist on the production of the bond before any account is stated, because the endorsements on the bond may shew what credits ought to be allowed. The defendant has made no such allegation in his answer. He in fact admits that he is entitled to no other credits than for the deficiency in the land, the amount of the receipts, and some small claims for costs and fees. The evidence of his payments he has in his own hands. The difficulty arises from the subsequent acts of the parties in regard to some of the claims mentioned in these receipts: and on this point he has chosen to leave us in the dark.
[The judge then detailed minutely all the facts, and stated his inferences from them. A considerable space (about 7 pages) would be occupied by this portion of *27 the opinion; and the reporter omits it, because the facts will be found in the statement which he has made, and the reasoning of the judge was upon the particular circumstances, and not illustrative of any principle of law. The conclusion to which he came will appear by the decree, in which he and the other judges concurred.]
It remains to determine how the credits are to be applied.
It is not controverted that in ordinary cases the party who pays money has the power to apply it as he chooses. The rule has usually been applied where the creditor held different securities. But in the case of Pindall's ex'x v. The Bank of Marietta, 10 Leigh 481. there was but one debt; and judge Cabell, delivering the opinion in which the other judges concurred, says, that “ a debtor owing a debt consisting of principal and interest, and making a partial payment, has a right to direct its application to so much of the principal in exclusion of the interest, and the creditor, if he receives it, is bound to apply it accordingly.” It is argued that this rule of law is founded on the supposed agreement of the parties ; that a contract, express or implied, lies at the foundation of it. It is said that the creditor is not bound to receive the payment, unless he be permitted to apply it first to the interest; that this is his right. But as he may waive his rights, he may agree to a different application ; or if he receives the payment with directions so to apply it, the law implies the agreement from the act of receiving. And from this it is argued, that though persons sui juris may make such agreements, fiduciaries dealing with the trust estate have no such power; and that a person dealing with them with notice cannot be permitted to affect injuriously the rights of those interested in the estate, by such an application of payments.
To whatever source the power of the debtor is traced, whether to a supposed contract implied from the act of *28 recéiving payment with directions as to the application, or to a distinct rule of law independent of such contract, would seem to make no difference as to the re-suit. The law sanctions the power, either as just in itself, or arising from a fair and legal contract, and therefore to be enforced. When, therefore, the debtor here stipulated for such an application, he exacted nothing which the law forbids to others in his situation. The right is that of the debtor; he may decline making the payment, unless it is applied as be directs : and I do not perceive how this right is to be affected by the character of the creditor. If the bond had been given to the testator in his lifetime, the debtor’s right, as against him, would be clear. Can his death, in consequence of which the executor receives, change the obligation or impair the rights of the debtor ? The right is one of some value; as for instance in a case like the present, where the bond was for nearly 10,000 dollars, on which, when it became payable, nearly 1800 dollars of interest was due. Suppose the debtor, having the principal, and wishing to stop interest, insists on so applying the payment: if the creditor refuses to receive it, the debtor can put his money to interest, and so provide a fund to meet the interest on his debt as fast as it accrues, until he obtains the means to extinguish it entirely. But if the payment is applied to the interest, a balance of principal is left, and the debt accumulates again. And how is the creditor injured ? The interest on his debt is not an interest-bearing fund. If he refuses to receive the money and apply it to the principal, his interest remains as it was, a dead capital. If he does receive it, as money is worth the interest, he is receiving interest on precisely the amount he would have been receiving it upon if the money had not been paid. And how does the fact of his being a fiduciary vary this state of things? Whilst the debt remained unpaid, he was receiving interest on the principal alone: *29 by receiving th.e principal and reinvesting, the estate is not. injured. To hold that the power to direct the application in such cases does not exist, would in effeet be to decide that every debtor to a fiduciary must pay interest on the interest of his debt. If there were any agreement to give time or indulgence, the case might be different. But here nothing of that kind is suggested. If an executor or other fiduciary, after receiving a payment with a direction to apply it to the principal, neglects or delays to collect the interest so as to make it an interest-bearing fund, the cestui que trust, in a proper case, might charge him for such a breach of duly; and an agreement with the debtor to commit such a breach, might charge him. But here the debt was due. Notwithstanding the receipt, the executor might the next day have proceeded to enforce payment of the balance, principal and interest, by a suit, or a sale under the deed of trust. If he improperly delayed, the debtor is not liable for his neglect. There may have been, and (in the absence of all proof to the contrary) it is to be presumed there were, good reasons for the conduct of each in this case. By the direction of the will, the money was to be put out at interest. It was well secured by the bond of the purchaser, and the deed of trust. The executor may have thought it to be for the benefit of all to let the debt rest in that condition. There is some hazard in lending money. Experience has shewn that investments, even in government securities, are sometimes precarious. It was equally the interest of the debtor to relieve himself from this consuming moth, though few men in our country could at once command the means of discharging so large a sum. By retaining the money and using it, he would at least be realizing as much interest as was accumulating against him on the same amount of the debt; and therefore he properly insisted, that if it were received, he should derive the like advantage from it, by apply *30 ing it to the principal; in the mean time leaving it to the executor, in the discharge of his duties, to enforce payment of the balance at once, or permit it to remain. The same reasoning applies to the bonds of Guerrant. While Miller retained them, the interest equalled the interest of a like amount of his principal, and when the executor received them, he was entitled to the accruing interest on them; the operation being precisely the same as if the money had been paid to the executor and at once loaned out, attended with this advantage, that whilst Miller continued bound as assignor, the executor acquired the additional security of Guerrant's bonds. In any view I can take of the transaction, it appears to me that the agreement was perfectly legal, and could only affect the estate injuriously, in this or any case, by an improper delay of the executor to enforce payment of the residue. For this, if any such delay occurred, Miller is not responsible. It has been argued, that after Miller assigned, he impeded the collection by his injunction. The bill did not injoin the executor from proceeding to collect the bonds of Guerrant; it sought to prevent a sale by the trustee for the balance due. Miller's bill and injunction interposed no obstruction to the proceedings against Guerrant.
It seems to me, therefore, that the cases which have held the debtor liable for aiding in a fraudulent misapplication of the funds of the estate to the debts of the trustee, have no bearing on this case. In insisting on the application of the payments to the principal, the debtor exercised no more than a legal right. In agreeing to it, the executor subjected the estate to no loss. The interest would have remained a dead fund, if he had refused to receive the payment. The loss, when any loss is sustained from such an application, results from the subsequent improper delay of the executor in proceeding to enforce payment of the balance. For such improper delay, the executor may under certain *31 circumstances be held liable; but the debtor is not responsible, unless he has entered into an agreement to procure such improper indulgence, and the payment has been made in pursuance thereof. I think the court erred in disregarding the agreement of the parties here.
The decree drawn by judge Allen was concurred in by the other judges, and entered in the following terms:
This court is of opinion that the circuit court erred in deciding that the appellant Miller was entitled to credit for the whole amount of the bonds of Guerrant assigned to Isaac Curd the executor of Frederick Argyle; and that there was error in deciding, that, under the agreement of the parties, and the circumstances of this case, the debtor was not entitled to apply the payments evidenced by the receipts dated the 30th of October 1820 and the 21st of January 1822, to the principal of the debt. The decree is therefore reversed with costs, and the cause remanded, with instructions to recommit the report to a commissioner, to audit, state and settle the accounts upon the following principles.
The commissioner is to charge Miller with the amount of the last bond, deducting therefrom the price of the 16J acres of land as of the date of the bond, and also allowing all the other credits allowed in the commissioner’s second report, made under the order of October 19. 1837, recommitting the former report; and also a further credit, as of the 25th of September 1825, for the excess due at that time on the judgments assigned, over the sum of 1772 dollars 97 cents,* the amount claimed by Miller as having been overpaid; the reassignment of the judgments being evidence that such excess was paid by Miller to Curd as a consideration for the reassignment. And Miller is to be also allowed a *32 further credit for the sum of 1080 dollars injoined by Guerrant, in the event of his shewing, by satisfactory proof, that this sum has been paid to Curd or the legatees of Frederick Argyle ; but not otherwise.
And in stating the account, all payments received under the two receipts before mentioned, and also the amount assumed to have been paid by Miller, as the difference between the sums before referred to, at the settlement in September 1S25, should be applied to the principal of the debt, according to the terms of the receipts, as of the times when the notes on which payments were received fell due : that is to say, where the entire note was paid, crediting the principal of the note paid, as of the date it fell due, against so much of the principal of the debt; and where but part of the note was paid, crediting the payments, and the payment supposed to be made in consideration of the reassignment at the settlement in 1825, against the principal, as of the dates of such payments, actual or assumed.
And the commissioner is to report the said accounts to the circuit court, together with any special matter deemed pertinent by himself, or required by either of the parties to be stated, in order to a final decree.

 This sum of 1772 dollars 97 cents is the same mentioned in the addition to Miller’s statement. That addition will be seen ante, p. 7.